DINKLER *et al. v.* POTTS & POTTS *et al.,* and *vice versa.*

1. Goods fraudulently purchased under circumstances which entitle the vendor to a rescission for fraud, do not become the property of the purchaser so as to enable him to mortgage them to an existing creditor as security for an antecedent debt, and thus create a mortgage lien superior to the title of the vendor, who, on discovery of the fraud, rescinds the sale and reclaims the goods, the mortgagee not paying anything nor parting with anything as a consideration for the mortgage, but the consideration being the antecedent debt only. A mortgage in this State passes no title, and while the rights of a mortgagee who parts with value at the time he obtains the mortgage are protected the same as if he had purchased and acquired title, the principle on which such protection is afforded does not apply to the case of a mortgage taken purely as security for a debt already in existence. Tootle *v.* First Nat'l Bank (Neb.), 52 N. W. Rep. 396, and cases cited.
2. There was no abuse of discretion as to the matters complained of by the cross-bill of exceptions. *Judgment affirmed.*
    August 1, 1892.

Debtor and creditor. Mortgage. Fraud. Title. Before Judge MILLER. Bibb county. March 31, 1892.

Potts & Potts, Altmayer & Flateau and others brought their equitable petition against C. S. Smith, their debtor, and Ira L. Smith and L. J. Dinkler, holders of mortgages given by C. S. Smith. They prayed for the appointment of a receiver; that they might separate the goods sold by them from the general stock, and that such goods be delivered to them upon their entering into bond, or that the receiver be required to sell the

goods in separate parcels, keeping the funds arising therefrom separate and distinct so that the same could be identified, and that petitioners' rights to the fund attach thereto in lieu of taking possession of the goods; that the receiver sell the goods not claimed, and hold the proceeds until all the issues under this petition could be determined, that he at once demand of and receive from C. S. Smith, and C. S. Smith be directed and required to deliver to him, all other goods in his possession, custody or control, and also the cash now in his possession, power, etc.; that the receiver also be directed to demand and receive of the brother of C. S. Smith the goods alleged to have been fraudulently shipped to said brother; that Dinkler and Ira L. Smith be enjoined from further foreclosing their mortgages upon the stock of goods, or interfering therewith in any manner; that after petitioners should first credit their claims with the amount of goods on hand, they might have judgment against C. S. Smith for the balance due them; that Dinkler and Ira L. Smith deliver their mortgages, and that the same be cancelled, etc. After the hearing, the court ordered that a temporary receiver (the deputy-sheriff) advertise the goods in his possession for sale at the store in which they were situated, for cash, at public outcry; that in making said sale he should sell the goods identified and claimed by each of petitioners, in separate parcels or lots, and keep a separate account of the amounts for which each identified lot of goods was sold, so that it could be determined at any time the amount for which each creditor's goods sold, and he should hold the proceeds arising therefrom subject to the order of the court. In this order it was stated, that the court found that the claim to the identified goods on the part of said creditors was superior to the mortgage liens of Dinkler and Smith, on the ground that the title to said creditors' goods purchased in fraud, was superior to the

lien of mortgages given to secure pre-existing debts, and on that ground alone the injunction was granted as prayed for, as to the goods claimed. The court further found that the mortgages of Dinkler and Smith were *bona fide* and were given to secure pre-existing debts, and as to the goods not claimed the application for injunction and receiver was refused, the deputy-sheriff being directed to sell such unclaimed goods at the same time and place, but separate from the claimed goods, and that the proceeds arising therefrom should be paid to the mortgagees, to be credited *pro rata* on the mortgages, less costs. To that part of the decision holding that the claims to the identified goods was superior to the mortgage liens, Dinkler and I. L. Smith excepted, and also to the portion of the decision granting an injunction; and it is further alleged by them that the judge erred in not refusing an injunction not only as to the goods not claimed, but also as to the goods claimed to be identified by petitioners. The petitioning creditors excepted to the ruling of the court in not granting an injunction as to the unclaimed goods as well as the claimed goods, the exceptions being for various reasons and upon various assignments of error set forth in their cross-bill of exceptions.

The original petition alleged that the petitioners were creditors of C. S. Smith in sums set forth in the petition, making an aggregate of $2,464.91, for goods, nearly all of which were delivered to said Smith within the preceding sixty days, and a very large proportion of them within the month preceding the filing of the petition. Petitioners shipped the goods to Smith because of the confidence they had in him, on account of continued business dealings, and also on account of his representations to them as to his solvency and ability to pay for the goods. The representations were in many instances made in person to petitioners, and otherwise, to induce

them to extend the credit and deliver the goods. At the time he induced them to deliver the goods he was absolutely insolvent and never intended to pay for them; he knew of the special confidence that each of petitioners reposed in him, and that they were delivering the goods to him under the belief, from his conduct and representations, that he was solvent. When he obtained the goods his purpose was not to pay for them, but to defraud petitioners, for on the 15th day of February, 1892 (the month in which the petition was presented), in collusion with his special friend and merchant neighbor Dinkler, and with his brother Ira L. Smith, C. S. Smith executed two mortgages, one to Dinkler to secure an alleged indebtedness of $981 10, the other to secure an alleged indebtedness of $1,025.95. These mortgages are without consideration, and were taken by Dinkler and Ira Smith with full knowledge of the insolvency of C. S. Smith, and that his purpose in executing the mortgages was to delay and defeat petitioners and other creditors in the collection of their debts, for the pretended mortgagees now claim and state to petitioners that the mortgages were given to secure a past due indebtedness contracted some months and years before their execution, and yet Dinkler stated a short while before the execution of the mortgages that said Smith was not indebted to him in any sum. Altmayer & Flateau, knowing of the intimacy between C. S. Smith and Dinkler, as Smith had applied to them to give him credit, made inquiry of Dinkler as to Smith's standing, and asked whether Smith was indebted in any sum. Dinkler replied that he was not, that he had quit selling goods at wholesale. On their going to him after they had learned of the execution of the mortgages, and demanding to know why he had made such a statement when he claimed that the mortgages were given to secure a past due indebtedness, he replied that it never

occurred to him at the time of the inquiry that Smith was indebted to him for borrowed money. Dinkler has no property other than a small stock of merchandise which would not, if put upon the market, bring as much as the homestead laws would, allow him, so that petitioners charge him to be insolvent so far as [extends] his ability to respond to any judgment they might obtain in the event the proceeds of the property covered by his mortgage should go into his hands. As to Ira L. Smith petitioners charge that within the last few years he failed in business, has not a dollar's worth of property in his own name, and his mortgage is a sham and a fraud upon them. The mortgages cover the entire stock of groceries in the storehouse, and also the fixtures, which is all the property now in possession of or owned by C. S. Smith, except what he has fraudulently concealed and the cash in his possession, and which is the only fund out of which petitioners can collect anything upon their demands. The goods are now in the hands of the deputy-sheriff under a foreclosure of the mortgages. There is not more than $1,200 or $1,500 worth of the property, and if put up and sold by the sheriff it will not bring more than fifty cents on the dollar. The stock now consists largely and almost exclusively of the goods delivered to said Smith by them as above stated, and they desire to reclaim their goods so far as the same may be now in the store, etc. Dinkler and the Smiths are all in collusion, for while the mortgages were executed on the 15th day of February, and at the same time and place, drawn by the same person and attested by the same witnesses, the mortgages were pocketed and not delivered to the clerk for record until February 22d. They were then delivered to the clerk at the same time, and the same entry of filing is on each; they were recorded the same day, and immediately foreclosed; and between the time of the execution and

record said Smith continued to buy of petitioners goods on credit, and placed them in the stock, and between the 15th and 22d a considerable portion of petitioners' goods, as shown by the bill of particulars attached, went into the store. On the very date and at the very time the mortgages were executed, affidavits of foreclosure were drawn up and dated on the 15th, but these also were pocketed with the mortgages and kept secret, the purpose being to foreclose the same at any moment, in the event any creditor should attempt to file a creditor's bill, so that it could then be set up that said Smith was no longer a trader and that the bill could not therefore lie. This is a fraud upon the law, and defendants cannot by this collusive arrangement deprive petitioners of the right to have the goods placed in the hands of a receiver, especially as their goods, to which they desire to assert title, are mixed and mingled in one common stock, and more especially as their claims for the balance are past due, and payment thereof has been demanded of C. S. Smith, by whom payment was refused. In order to carry out said collusive arrangement, Dinkler and Ira L. Smith on February 23d filed a joint petition to the ordinary, asking for a quick sale of the goods, and notwithstanding the statute requires ten days notice, C. S. Smith, in collusion with the mortgagees, acknowledged service thereon the same day and waived all further service, consented to the granting of the order on that day, and on that day an order was granted, directing the goods to be sold on March 5th, when they will be sold and the proceeds paid upon the pretended mortgages, unless restrained by the court. Within the last three months petitioners alone have delivered C. S. Smith goods to the amount of $2,464.91, and they believe there are other creditors who have delivered him goods in large amounts. He now claims he is indebted to the two mortgagees $2,000, while his stock on hand

does not amount to more than $1,000 or $1,500, while he states there is nothing on his books because he sold only for cash. This would be a deficit of about $3,000, and petitioners charge that Smith has in his possession, power, custody or control, large sums of money which he realized from the sale of their goods fraudulently obtained from them. He has recently removed from the store and concealed large quantities of goods. While he is not a wholesale dealer, on February 12th he shipped to his brother, J. G. Smith, large quantities; and on February 18th, even after the execution of the mortgages, he shipped his brother large quantities; and on the 17th and 18th days of February, shipped quantities of goods to other parties.

Dinkler answered, denying the charges of fraud. He alleges that C. S. Smith, at the time of the execution of the mortgage, justly and honestly owed him and now owes him the amount evidenced by notes and accounts set out in the mortgage. For the note which he holds against C. S. Smith dated March 24, 1891, and indorsed by I. L. Smith, he paid in cash to C. S. Smith $400, and C. S. Smith upon the receipt thereof gave him the note indorsed by I. L. Smith, for said amount, and the note was for the consideration aforesaid. On January 1, 1892, C. S. Smith came to him and represented that he was in distress and in need of money to take out a business license, and having confidence in his ability and honesty, and upon his offering to have his note for the amount indorsed by I. L. Smith, whom this defendant knew to be financially responsible and good security for the amount, defendant paid in cash to C. S. Smith $200, receiving his note therefor indorsed by I. L. Smith, for which note the money was the consideration. On December 14, 1891, the account due this defendant for which he has received security in the mortgage began to run, and C. S. Smith received the goods for which he

stands charged upon the account, an itemized statement being attached to this answer, and honestly and justly owes this defendant for the same, some of which goods defendant is advised are yet in the storehouse of C. S. Smith. The statement in the petition that Altmayer & Flateau, upon inquiry of this defendant, asked him whether C. S. Smith was indebted to him in any sum and received the reply that he was not, is false. What was asked of this defendant by Altmayer was, whether C. S. Smith owed this defendant for any goods, to which defendant replied that he did not. Defendant did not at any time say to either Altmayer or Flateau that C. S. Smith was not indebted to him, nor did he make such statement to any one else, for he could not have done so, holding as he did the note signed by C. S. Smith for $400 borrowed money, which he had in his safe at the time. The allegation that he told either Altmayer or Flateau, after the execution of the mortgages, that it never occurred to him at the time of the inquiry that Smith was indebted to him for borrowed money, is false. The allegation in the petition that this defendant has no property above the exemptions allowed him by law, is also false, for he has invested in his business above $5,000, is unmarried and not entitled to any homestead or other exemption, and is able at any time to raise from stocks, bonds and other collaterals not less than $10,000; and in furtherance of this showing, asks the court to allow him to give any bond the court may require to answer any judgment that may be rendered against him in the proceeding, and to dismiss the injunction and refuse the prayers of the petitioners so far as they affect him. It is true that his mortgage was executed February 15th, and not recorded until February 22d, but for the reason that upon the drawing up and execution of the mortgage, and after the affidavit had been drawn at his direction by his attorney, C. S. Smith begged that

he would not record and foreclose the mortgage until the expiration of a week, promising to pay him $500 thereon within that time, and in the hope of securing this amount defendant refrained from recording his mortgage at once, but did record it on February 22d, using the same affidavit of foreclosure that he had prepared and intended to use before such promise was made and indulgence granted, and he did not intend to prevent in any manner the enforcement of any rights of the creditors of C. S. Smith. It is untrue that in collusion with I. L. Smith this defendant filed a petition to the ordinary, asking for a speedy sale of the stock, for the purpose of defrauding any one, or perpetrating a wrong upon any one; his object being purely and entirely to obtain the best price for the stock and prevent its deterioration from keeping, which is now depreciating the value of the goods daily, and to prevent the accumulation of expenses for rent, etc. He loaned the $600 to C. S. Smith, because he was his friend and he had confidence in his intention to repay him, and because he knew that the notes were absolutely good and secure when indorsed by I. L. Smith, who is able to respond to a judgment against him for said amount.

I. L. Smith answered denying his insolvency, denying the allegations of fraud, alleging that the debt secured by the mortgage held by him was just and *bona fide*, the mortgage being given to secure notes for cash advanced by him to C. S. Smith in April, 1888, March, 1891, October, 1891, December 1, 1891, and December 9, 1891, the advance being by way of checks upon the Exchange Bank of Macon, for which he offers to show the checks themselves. His mortgage was not recorded until the 22d, because he desired to give his brother all possible indulgence, hoping after the execution of the mortgage and the preparation of the affidavit of foreclosure, which was drawn with the purpose of closing up the store im-

mediately, upon the promise of his brother to attempt to raise a part of the money due this defendant in a week if defendant would not foreclose at once, that C. S. Smith might be able to pay defendant something and avoid the necessity of such a step; and this defendant had no intention to prevent any creditor from attempting to enforce his rights against C. S. Smith.

C. S. Smith answered, alleging that the claims of several of the petitioners were not due in whole or in part, and the claims of others were only partly due. He denied the allegations of fraud, but alleged that when he purchased the goods he did so with the belief that he would be successful in carrying on his business and would be able not only to pay for the goods and the money with which, through the kindness of his brother and Dinkler, he had been enabled to open the business, but also to make for himself and family a good living. He had previously been in business at Wayside and was burned out without insurance, but by his own efforts and with the aid of his brother, who furnished him the money, he had been able to satisfy every dollar's worth of claims that grew out of such misfortune. While at some time he may have said to different parties that he was able to meet all demands upon him and would be able to pay whatever indebtedness he had or might contract, he never made specific representations as to his solvency for the purpose of obtaining any special credits thereon, but believing that with the goods and merchandise he would be able to carry on a successful and profitable business, may have told and told truthfully that he would be able to meet and pay and was able to meet and pay whatever debts he contracted. It was not necessary for him to make the representations alleged in the petition, to obtain credit, for twice before he had been in the same business and had dealt with most of the petitioners, and had paid them every dollar he owed

them.   He denied the charges of collusion with Dinkler or I. L. Smith; set up that his indebtedness to them was *bona fide*, and facts as to the execution of the mortgages, etc., similar to those alleged by Dinkler and I. L. Smith.   He further denied the shipments of large quantities of goods to J. G. Smith, etc.

Upon the hearing much testimony was introduced, which was of conflicting character.

DESSAU & BARTLETT and ROLAND ELLIS, for plaintiffs. in error.

HARDEMAN, DAVIS & TURNER, STEED & WIMBERLY, L. D. MOORE, T. B. WEST and J. R. FRIED, *contra*.